UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------x
                                          :
DONNA A. GALLEGOS                         :           3:13 CV 393 (JGM)
                                          :
V.                                        :
                                          :
CAROLYN W. COLVIN,                        :
ACTING COMMISSIONER OF                    :
SOCIAL SECURITY                           :
                                          :           DATE: FEBRUARY 14, 2014
--------------------------------------------------------- x

RECOMMENDED RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE
COMMISSIONER

        This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"].

I.  ADMINISTRATIVE PROCEEDINGS

        On July 28, 2010, plaintiff Donna A. Gallegos, applied for DIB claiming that she has

been disabled since December 23, 2009,[1] due to a back, left arm, neck and shoulder injuries,

numbness and weakness in her left hand, and high blood pressure. (Certified Transcript of

Administrative Proceedings, dated May 17, 2013  ["Tr."] 79, 101-04, 189-95; see also Tr.

210-22).  Plaintiff's application was denied initially and upon reconsideration.  (Tr. 106-08;

see Tr. 100, 105, 243-48, 257-65).  On April 6, 2011, plaintiff filed a request for a hearing

before an Administrative Law Judge ["ALJ"](Tr. 111; see Tr. 112-15), and on January 31,

2012, a hearing was held before ALJ Amita Tracy, at which plaintiff testified in-person and

James Cohen, a vocational expert (see Tr. 172-78), testified by telephone. (Tr. 26-78; see

---

        [1]At her hearing, plaintiff testified that her onset date is the date of her disabling motor
vehicle accident, which was December 1, 2009 (Tr. 31), but she later clarified that she continued to
work until December 23, 2009, so that December 23 is her onset date.  (Tr. 36-37).

Tr. 123-53 (hearing originally scheduled for 1/18/12), 154-88)).   Plaintiff has been represented by counsel. (Tr. 9, see Tr. 26, 109-10, 117 (different counsel represented plaintiff at the administrative level)).   On February 9, 2012, ALJ Tracy issued her decision finding that plaintiff has not been under a disability from December 1, 2008 through the date of her decision.  (Tr. 10-21).  On April 12, 2012, plaintiff filed her request for review of the hearing decision (Tr. 7-8), and on January 30, 2013, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).

On March 21, 2013, plaintiff filed her complaint in this pending action.  (Dkt. #1).[2] On June 11, 2013, defendant filed her answer (Dkt. #10), and on July 25, 2013, plaintiff filed her Motion to Reverse the Decision of the Commissioner, with brief and exhibits in support. (Dkt. #14; see Dkts. ##12-13).[3]  On November 18, 2013, defendant filed her Motion to Affirm the Decision of the Commissioner and brief in support (Dkt. #19; see Dkts. ##15-18),[4] and nine days later, a copy of the certified administrative transcript, dated May 17, 2013, was filed.  (Dkt. #20).[5]

For the reasons stated below, plaintiff's Motion to Reverse (Dkt. #14) is granted in limited part and denied in large part, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #19) is denied in limited part and granted in large part.

---

[2]Plaintiff also filed a Motion to Proceed in Forma Pauperis (Dkt. #2), which motion was granted six days later.  (Dkt. #7).

[3]Attached to plaintiff's motion are the following exhibits: Range of Joint Motion Evaluation Chart, and copies of unpublished case law.

[4]Attached to defendant's motion is a copy of unpublished case law.

[5]There was a fair amount of duplication of medical records in the administrative transcript.

## II. FACTUAL BACKGROUND

## A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

Plaintiff was born in 1964 and is forty-nine years old.  (Tr. 31, 210).  Plaintiff completed the twelfth grade, and she took one additional computer course when her daughter was young.  (Tr. 35).  She is divorced, and has one adult daughter who lives with her in a first floor apartment.  (Tr. 32-33, 61-62, 223).[6]

Plaintiff described her typical day as getting up, brushing her teeth and combing her hair, and then making sure her daughter can do the laundry, clean the floors, help her get dressed and help her up and down the stairs.  (Tr. 56; see Tr. 223, 249).[7]  Plaintiff has "trouble[]" doing her hair and showering or doing "anything that requires any type of bending or any lower part of the body."  (Tr. 60; see also Tr. 259, 263).   Plaintiff reported "trouble" doing dishes, and preparing food because of pain in her arm.  (Tr. 224, 250).   Her daughter helps her make dinner.  (Tr. 225, 251). Additionally, she finds it "hard" to button her clothing, put on socks and shoes, hold a razor or other items, or stir.  (Tr. 224, 250).  Plaintiff likes to read, and reads the Bible daily (Tr. 57, 223, 249), although she also reported that it can be hard to hold a book, "or [she] might have to shift position a lot." (Tr. 227, 253).

Plaintiff no longer drives (Tr. 34-35); she travels by public transportation.  (Tr. 35, 61).  According to plaintiff, she is "[n]ot sure if it would be safe to drive" because her arm and hand on her left side do "not have all feeling and will hurt or be painful most of [the] time." (Tr. 226; see also Tr. 252).

---

[6]Plaintiff's daughter receives disability benefits for a mental disability.  (Tr. 66).

[7]In her initial application, plaintiff reported that she does housework, washes dishes and "sometimes" does laundry, and washes floors or vacuums, but she also noted that it has "become hard for me to do [these chores]."  (Tr. 223; see Tr. 224, 226, 250, 252).

3

Plaintiff has two dogs that her daughter takes care of, although plaintiff also reported that she feeds them and given them medicine.  (Tr. 57-58, 223-24, 249). Plaintiff takes care of all of her daughter's finances,[8] and "sometimes . . . go[es] to the doctor['s] with her[.]" (Tr. 66-67; see Tr. 249).

Plaintiff described her injury as "from her neck . . . into [her] shoulder and [her] back, and also [her] arm and hand . . . ."  (Tr. 43).   Plaintiff described the pain as at the base of her neck and her shoulder, and it "goes down into [her] arm down into [her] hand." (Tr. 51). According to plaintiff, she "drop[s] stuff, daily, with [her] hand.  And even [her] other hand bothers [her]  at times where [she] still drop[s] things with that one too."  (Tr. 43-44; see Tr. 65).  Her left hand is "definitely worse[]" and she does not have all the feeling in her hand.  (Tr. 44).  She testified that she also drops things from her right hand too.  (Id.). According to plaintiff, her left arm and hand are still swollen from her accident in December 2009.  (Tr. 230).

In addition to her hands, plaintiff has pain "across [her] shoulder blades[]" and she cannot stand in place without shifting her weight. (Tr. 44, 51).  According to plaintiff, standing makes the pain "a lot worse." (Tr. 52). Plaintiff described the pain as though you are "wearing a backpack and it just, like, never  – – you never take it off.  It's just always there[.]"  (Id.).  Plaintiff testified that she also experiences dull pain in her arm too.  (Id.). According to plaintiff, the pain is between a seven and ten but "it can go to [twenty]."  (Tr. 64-65).

Plaintiff opined that she could sit for twenty minutes, she could not stand,  she could walk about one or two blocks, and lift a can of vegetables or about two pounds "if I'm lucky."

---

[8]See note 6 supra.

(Tr. 53; <u>see also</u> Tr. 229, 250 (cannot carry grocery bags), 253, 255).  She would drop items if she tried to carry them, especially out of her left hand.  (Tr. 54). According to plaintiff, her injuries affect her ability to lift, squat, bend, stand, reach, walk, sit, climb stairs, or use her hands.  (Tr. 228, 254).

Plaintiff takes or has taken Hydrochlorothiazide (Tr. 225, 251, 262, 313, 405-09, 511), Atenolol (Tr. 225, 251, 262, 313, 405-07, 511) or Metoprolol (Tr. 281), Lisinopril (Tr. 225, 262, 281, 405), or Accupril (Tr. 225, 313, 406-09, 511), Norvasc (Tr. 408-09), Chlorthalidone (Tr. 281), and Ibuprofen (Tr. 225, 251, 262, 281) or Motrin (Tr. 313, 405-07, 511).   Plaintiff testified that medication does not help and she gets "very sleepy[,]" dizzy or drowsy when she takes medication.  (Tr. 47-48).  As a result, she naps for about one or two hours daily, and then has difficultly sleeping during the night.  (Tr. 58-59).  Additionally, plaintiff explained that she does not like to take medication because she has a cousin who was addicted to pain medication so she tries not to take it "excessively, only when [she] really [has] to[ ]."  (Tr. 225).  Plaintiff testified that the physical therapy does not work (Tr. 48; <u>see</u> Tr. 64), although she also testified that the exercises that she was taught do help and she takes Motrin which helps "once in a while[.]" (Tr. 52).  She also uses heat or ice packs to keep the swelling down.  (<u>Id.</u>).  According to plaintiff, she is not a candidate for surgery.  (Tr. 64).

Plaintiff testified that she has "trouble focusing a lot." (Tr. 49; <u>see also</u> Tr. 228).  In plaintiff's words, it is "like my mind kind of wonders off.  I don't know. And also, to, like, read recipes or whatever, I don't always remember what I'm reading.  I have to, like, read it over and over again." (Tr. 49; <u>see</u> Tr. 59, 225, 229, 251).  According to plaintiff, she has trouble remembering, paying attention or concentrating, all of which she attributes to her medication.  (Tr. 54-55, <u>see</u> Tr. 228 (difficulty completing tasks, following instructions)).  She has "[g]ood

5

days and bad days. On [a] bad day, [it is] very hard [for her] to focus[,]" not more than twenty to thirty minutes. (Tr. 229). Plaintiff reported that she does not handle stress well; she gets very frustrated and will start crying. (Id.; see also Tr. 255). Plaintiff sees a counselor twice a month for depression, which "does help some[.]" (Tr. 50). According to plaintiff, she tried to see a psychiatrist but her insurance "discontinued [her], the Friday before the appointment." (Tr. 230).

B. PLAINTIFF'S WORK HISTORY & VOCATIONAL ANALYSIS

Plaintiff testified that she received unemployment for the "whole year of 2010[,]" and applied for, but only received eleven weeks of worker's compensation benefits. (Tr. 34, 196-97). Plaintiff last worked part-time in December 2009 as a bus driver. (Tr. 36, 39; see Tr. 198-99, 206, 266). Plaintiff drove a mini bus and a large bus. (Tr. 40; see also Tr. 267, 282). When driving the mini bus, she picked up a child who was in a wheelchair and she would strap the wheelchair to the floor of the bus which required her to bend and pull the straps. (Tr. 40, 273). In that job, plaintiff would walk for one half hour of her work day, sit for five hours, and kneel, climb, crouch, reach, or write, and type or handle small objects for one hour of her work day. (Tr. 267). When working in this last job, plaintiff was in an accident. (See Tr. 62). Plaintiff was stopped at a red light when an inattentive driver "slammed into the back of the bus." (Id.). Plaintiff lost consciousness, and she injured the base of her neck, her shoulder and her left arm. (Tr. 62-63).[9] Plaintiff testified that she stopped working because the "[t]he pain was just a lot worse[]" (Tr. 37), and she was not able to pass the medical qualifications necessary to be a bus driver. (Tr. 38-39).

---

[9]Plaintiff also opined that the seat belt "going against my chest probably bruised, like, my heart or something, which is why I have to take all that medication because I never took medication for blood pressure before." (Tr. 63-64).

Prior to driving the school buses, plaintiff worked full-time at the Yale Bookstore as a supervisor, and prior to that, she worked full-time for Wal-Mart "for about a year or two." (Tr. 40-41, 42, 69, 71; <u>see</u> Tr. 207-08, 266, 282-83).  According to plaintiff, she "never really ended" her job at the bookstore; her boss "took [her] off the schedule because [she] was trying to work two jobs."  (Tr. 41).  When working as a floor supervisor at the bookstore, plaintiff "made out [the] break schedule, walked [the] floor to see what items needed to be stocked, [and] [a]ssigned employees to stock different items or run registers."  (Tr. 268; <u>see</u> Tr. 274).  She walked and stood for eight hours, climbed, reached and wrote, typed or handled small objects for two hours, and she stooped and handled, grabbed or grasped big objects for four hours in her work day.  (Tr. 268).   She frequently lifted ten or less pounds. (<u>Id.</u>). When working for Wal-Mart, plaintiff stocked and maintained the shoe department and kept the aisles clear.  (Tr. 269; <u>see</u> Tr. 274).   She walked or stood for eight hours, climbed, stooped or reached for three hours, handled, grabbed or grasped for two hours, and wrote, typed or handled small objects for one hour of her work day, and she frequently lifted ten pounds or less.  (Tr. 269).  In the late 1990s, plaintiff worked for CX Data, and as a teacher's aide.   (Tr. 42-43, 71; <u>see</u> Tr. 205-06, 266, 272, 282).   When she worked as a "[p]icker/[p]acker[,]" (Tr. 266), she walked, stood, handled, reached, and wrote, typed or handled small objects for six hours of her work day.  (Tr. 270).  She carried boxes or crates to a rolling conveyor belt for about three hours a day.  (<u>Id.</u>; <u>see also</u> Tr. 274).  She frequently lifted ten pounds or less.  (Tr. 270).  When working as a teacher's aide, plaintiff helped the teacher by supervising thirty-two children, correcting papers, and making copies.  (Tr. 271; <u>see also</u> Tr. 274).  She walked for three hours, stood for five hours, sat, kneeled, crouched and reached for one hour, and wrote, typed or handled small objects for two hours.  (<u>Id.</u>).

At plaintiff's hearing, the vocational expert testified that plaintiff's past work as a bus driver for a handicapped minivan and for school buses was semi-skilled, medium work.  (Tr. 68).   Her work as a supervisor in a bookstore was skilled, light work (Tr. 69), and according to the vocational expert, that work included transferable skills for setting schedules, hiring, and computer skills, which would be "typical supervisory skill[s.]" (Tr. 71).   Plaintiff, however, clarified that she set lunch schedules, someone else set the other schedules for the week, and she did not hire or fire coworkers.  (Tr. 72).   Her work as a sales associate at Wal-Mart was semi-skilled, light work, and her work as a packer was unskilled, medium work.  (Tr. 69).   Plaintiff's work as a teacher's aide was skilled, light work. (Tr. 69-70).

In response to a hypothetical posed by the ALJ of someone "limited to medium work, except that the individual can occasionally and frequently lift and carry up to [twenty-five] pounds[,]" "could stand, walk, or sit up to six hours in an eight hour work day[,]" who is limited to "frequent climbing of ramps and stairs, frequent stooping, frequent kneeling[,]" and further limited to "occasional climbing of ladders ropes or scaffolds, and . . . occasional crawling[,]" the vocational expert opined that person could perform work as a bus driver, a supervisor, a sales associate, a packer, and a teacher's aide.  (Tr. 73-74).   Additionally, a person with those hypothetical limitations could also perform work as a billing clerk, a dispatcher, and a cashier.  (Tr. 74-75).

In response to a second hypothetical posed by the ALJ of an individual "limited to sedentary work who could lift, carry, push or pull [ten] pounds or less," could "sit, stand or walk for four hours with a sit/stand option such that the individual could sit for [twenty] minutes, stand for a few minutes, and sit as [needed]," as well as "limited to occasional

8

climbing of ramps and stairs, occasional kneeling, climbing of ladders, ropes or scaffolds, occasional crawling, . . . and no stooping or crouching," the ALJ opined that such an individual could not perform the work described above, but could perform the work of a telephone operator, telemarketer, or claims clerk.  (Tr. 75-76).  If the limitation of occasional handling and fingering was added, that hypothetical individual could not perform any of the referenced jobs or any other work.  (Tr. 76).

C. MEDICAL RECORDS

Plaintiff's medical records begin on December 6, 2008 when plaintiff was seen at Hill Health Center Internal Medicine for a follow-up examination after being diagnosed with pneumonia.  (Tr. 404).  At that time, she weighed 218 pounds and her blood pressure was 156/96.  (Id.).  A year later, on December 24, 2009, the day after plaintiff's alleged onset date of disability, plaintiff was seen at the Cornell Scott-Hill Health Center Internal Medicine ["Hill Health"] for low back pain and upper back pain.  (Tr. 402-03).  She reported her pain as a three on a scale to ten.  (Tr. 402). The following conditions were noted: uncontrolled hypertension, with blood pressure readings of 200/120, 200/100, 188/110, and 170/98, dehydration, excess caffeine poisoning, and obesity.  (Id.).

Plaintiff returned to Hill Health for a blood pressure check and complaints of neck, back and shoulder pain on January 7, 2010. (Tr. 336-37, 400-01, 531-32).  Plaintiff was seen in the emergency department of the Hospital of Saint Raphael ["St. Raphael's"] on January 27, 2010 for neck pain radiating to her shoulder and arm.  (Tr. 288; see Tr. 288-94).  She rated her pain level 0/10 and was in "no acute distress."  (Id.). She underwent imaging of her cervical spine which revealed "mild loss of disc height, endplate sclerosis and anterior osteophyte formation at C5-6," but an overall "[i]ncomplete study[,]" (Tr. 286, 321, 363), and

a scan of plaintiff's lumbar spine revealed disc space narrowing and facet hypertrophy at L5/S1.  (Tr. 287, 320, 362).

A week later, on February 8, 2010, plaintiff was seen at Hill Health for complaints of middle back pain and shoulder pain.  (Tr. 334-35, 398-99, 529-30).  She was dehydrated and was advised to continue a diet and exercise plan.  (Tr. 335, 399, 530).   Her blood pressure was 154/82 and her weight was 219.  (Tr. 334, 398, 529).

Plaintiff underwent an MRI of her cervical spine without contrast on March 3, 2010, the results of which revealed "[d]egenerative disc disease of C5-6[,]" resulting in "mild canal stenosis and severe right neuroforminal stenosis[,]" "[d]isc bulge with superimposed right paracentral disc protrusion abutting and mildly deforming the spinal cord at C4-5[,]" resulting in "right neuroforaminal stenosis[,]" as well as "mild right neuroforminal narrowing secondary to uncovertebral spondylosis" at C3-4.  (Tr. 361).

Plaintiff was seen by Dr. Phillip P. Luchini of Orthopaedic Surgeons, P.C. for an initial evaluation on March 10, 2010.  (Tr. 305-06). Dr. Luchini noted that plaintiff's range of motion in the neck and shoulders was not restricted and her reflexes in the left and right upper extremity were normal. (Tr. 306). His assessment was that plaintiff sustained a "muculoligamentous sprain of the cervical spine[]" and she had "some mild nerve root irritation to the left upper extremity."  (Id.).  He noted that her "MRI scan shows no significant stenosis of the neuroforamen on the left side[]" and he expected "her symptoms to resolve spontaneously." (Id.).   He advised her that she could return to her occupation as a bus driver with unrestricted activity in five days, on March 15, 2010.  (Id.).

When plaintiff was seen by Dr. Luchini on April 6, 2010, she continued to report problems with her left upper extremity and neck; she had "some left-sided neck pain"; her

range of motion of her shoulder was unrestricted.  (Tr. 304).  Two days later, plaintiff was seen at Hill Health for her complaints of neck pain and left hand pain, which she rated as a seven out of ten.  (Tr. 333, 397, 528).  Her hypertension and obesity were noted and she was dehydrated. (Id.).  She had gained fifteen pounds since her visit the month before.  (Tr. 333, 397; see Tr. 334).

On May 5, 2010, plaintiff was seen by Dr. Moshe Hasbani for a neurological consultation.  (Tr. 296-97, 485-86).  Dr. Hasbani noted that an MRI of the cervical spine had "shown degenerative disc disease at C5-6 and C4-5 with neuroforaminal stenosis on the right side but not on the left."  (Tr. 296, 485).  He noted that plaintiff is morbidly obese.  (Tr. 297, 486).  His impression was that plaintiff presented with "symptoms and findings consistent with cervical musculoligamentous sprain, preexisting cervical spondylosis, and symptoms of numbness in the left third and fourth fingers."  (Id.).  He recommended an electromyographic ["EMG"] evaluation.  (Id.).   On May 18, 2010, plaintiff returned for electrodiagnostic study with Dr. Hasbani.  (Tr. 298-300, 487-88; see also Tr. 489-90).   The results revealed "borderline conduction across the wrist for the median nerve on the left suggestive of an insipient carpal tunnel syndrome[,]" and there was "no evidence of cervical radiculopathy." (Tr. 298-99, 487-88).  Dr. Hasbani noted that it was "unclear to [him] whether [plaintiff's] symptoms of numbness of the left upper extremity [were] related to this borderline slowing across the wrist for the median nerve."  (Tr. 299, 488).  He recommended a trial of a wrist brace or steroid injection.  (Id.).

Plaintiff was seen by Dr. Luchini on May 24, 2010, who noted that plaintif's neck pain "probably represents a cervical sprain with some underlying cervical degenerative disc disease."  (Tr. 303).  He advised her that she may return to her occupation as a bus driver.

11

(Id.).

Plaintiff began care at the Dixwell Health Center on June 8, 2010.  (Tr. 331-32, 394-95, 526-27).  She complained of pain in her neck and left arm for the past six months.  (Tr. 331, 394, 526).  Plaintiff's history of hypertension was noted, as was her morbid obesity with a BMI of 46.7, her flat feet, and her chronic pain.  (Id.).  Plaintiff was prescribed Motrin, 800mg  (Tr. 332, 395, 527), and was advised to pursue physical therapy. (Id.).  Plaintiff was seen for a blood pressure check on June 14, 2010.  (Tr. 330, 393, 525).  On June 23, 2010, plaintiff was seen at Dixwell Health Center for point tenderness below and lateral to her elbow, but with no swelling and good range of motion and strength.  (Tr. 328-29, 391-92, 523-24).  Her hypertension had "significant improvement[.]" (Tr. 328, 391, 523).  On June 30, 2010, plaintiff underwent an initial visit at the Department of Health Promotion for nutrition counseling.  (Tr. 416-17).

Plaintiff returned to the Dixwell Health Center on September 15, 2010 for complaints of persistent left elbow pain.  (Tr. 326-27, 389-90, 521-22).[10] Her obesity with recent weight gain was noted, as was swelling in the left arm; however, the treating provider also noted that she had good range of motion and strength, although she identified her pain as a seven or eight out of ten.  (Id.).

One week later, on September 22, 2010, plaintiff was seen by Dr. Luchini for a follow-up examination, in which he noted that plaintiff reached her "maximum medical improvement and has persistent neck pain associated with stiffness[,]" along with difficulty rotating her neck to the left and right and some weakness to the left upper extremity and some parethesias in her left hand.  (Tr. 302).  He noted that there was no evidence of cervical

---

[10]The medical record reflects that plaintiff lost her insurance.  (Tr. 326, 389, 521).

radiculopathy and an MRI scan showed degenerative disc disease at C5-6 and a right central protrusion at the C4-5 level.  (Id.).  He opined that plaintiff was "capable of working as a bus driver at this time." (Id.).

On October 6, 2010, plaintiff was seen for a blood pressure check at Dixwell Health Center, and at Hill Health on November 3, 2010. (Tr. 324-25, 387-88, 519-20).

Plaintiff began physical therapy through St. Raphael's Outpatient Rehabilitation Services on November 9, 2010, and was seen on November 12, 19, 22 and December 1, 3, 8, 13, 15, 21, 2010, and on January 5, 10, 20, February 4, 7, 15, and May 3, 5, 9, 16,18, 2011.  (Tr. 343-57, 442-66, 471-74, 479-84, 491-510, 533-37).  On December 3, 2010, she reported a mild increase in soreness in her neck and lower back.  (Tr. 339, 466, 492).  On the same day, she was seen at Dixwell Health Center for chronic neck and left extremity pain; her blood pressure was well controlled, and her rehabilitation potential was "good[.]" (Tr. 322-23, 384-85, 518).  Plaintiff reported that she attempted to return to work but was terminated; she felt that was "wrongful termination" because although she had a "letter" that stated she could return to work, she did not think she could work due to her pain.  (Tr. 323, 385).

Six days later, on December 9, 2010, plaintiff's physical therapist, Terri Lowell, noted that plaintiff complained of an inability to mop or vacuum, a "[h]ard time washing dishes" due to an inability to stand more than five minutes due to pain and reports of dropping things; an inability to sit more than twenty minutes and an inability to walk more than four or five minutes due to pain; and decreased balance in the shower and weakness and numbness in her left upper extremity.  (Tr. 340-41, 468-69, 493-94).   Lowell also noted the following clinical objective findings: poor forward head posture, limited cervical range of motion, limited

range of motion in the left shoulder, grip strength of forty-five pounds in the right hand and thirty pounds in the left hand, decreased light touch third and fourth digits in her left hand, and positive dural signs with increased neck pain with the "Slump test[.]" (Id.).  Lowell also noted that plaintiff had a "[n]ormal movement pattern" throughout the examination with no difficulty observed during ambulation, sit to stand, sit to supine, or supine to sit.  (Tr. 341, 469, 494).  On December 21, 2010, plaintiff was re-evaluated by Outpatient Rehabilitation Services for the Hospital of Saint Raphael's for her lower extremity lumbar radicular symptoms.  (Tr. 338, 470, 491).

On February 28, 2011, while being seen at Dixwell Health Center for a "routine" follow up visit for chronic pain, the treating provider noted that plaintiff was sitting on the exam table without distress.  (Tr. 382-83).  Plaintiff was referred for a MRI of her left shoulder and for surgical weight loss.  (Tr. 383).

On March 12, 2011, plaintiff underwent an MRI of the left shoulder without contrast, the results of which were "[u]nremarkable[.]" (Tr. 364-65, 410-11).  On the same day, plaintiff also underwent an MRI of her cervical spine without contrast, which revealed "[c]entral/right paracontral disc extrusion at C4-C5 producing moderate canal stenosis and mild-moderate right-sided neural foraminal narrowing"; "[r]ight pracentral disc ostephyte complex at C5-C6 producing mild central stenosis and moderate right-sided neuroforaminal narrowing"; and "[d]egenerative changes at C3-C4.  (Tr. 366-67, 475-76).

On April 11, 2011, plaintiff was seen at Dixwell Health Center for her chronic pain, hypertension and obesity.  (Tr. 380-81, 477-78).  A month later, plaintiff returned to the Department of Health Promotion for nutrition counseling.  (Tr. 415-16).  Plaintiff was seen on May 13, 2011 at Yale Orthopaedics and Rehabilitation by Dr. Jonathan N. Grauer for

14

complaints of axial neck discomfort and "some lesser left upper extremity symptoms." (Tr. 359-60). Dr. Grauer informed plaintiff that he would not recommend surgery and her "upper extremity symptoms do not well map with the mid cervical changes by MRI and do not seem to be as much of her limiting factor." (Tr. 359). He recommended an exercise-based program and anti-inflammatories, as necessary. (Tr. 360).

On June 3, 2011, plaintiff was discharged from her physical therapy session, having "done very well," defined as receiving education as to proper posture and having her pain reduced to at most a one on a scale to ten. (Tr. 480).

On July 11, 2011, plaintiff returned for nutrition counseling. (Tr. 414). Two weeks later, plaintiff was seen at the Dixwell Health Center on July 25, 2011; her blood pressure was well controlled and she had lost ten pounds since her last visit. (Tr. 378-79). Moderate spinal stenosis at C4-5 and C5-6 was noted. (Tr. 379). On August 22, 2011, swelling in plaintiff's extremities was noted; she was advised to increase her fluid intake and eliminate sodium in her diet. (Tr. 376-77). Four days later, plaintiff received nutrition counseling for her obesity and hypertension. (Tr. 413). On September 2, 2011, plaintiff was seen at Dixwell Health Center for a blood pressure medication refill. (Tr. 374-75). She returned two weeks later for a follow-up for her complaints of neck and shoulder pain. (Tr. 373). Diet and exercise options were discussed. (Id.). On September 30, 2011, plaintiff received nutrition counseling. (Tr. 412).

In early October 2011, plaintiff was given a blood pressure monitor for her hypertension. (Tr. 371-72). On October 14, 2011, plaintiff was seen at the Dixwell Health Center for her hypertension, neck and back pain, hyperlipidemia, and obesity. (Tr. 369-70). On October 31, 2011, a Treatment Plan Review was completed by Dana Mongillo, MS, at the

Hill Health/Behavioral Health Division to assess plaintiff's treatment for depression from September 23 to October 23, 2011.  (Tr. 433-37).  Plaintiff reported depressed mood, sleep disturbances, difficulty concentrating, crying spells and fatigue.  (Tr. 436).  Plaintiff refused medication management, but she attended four weekly individualized sessions.  (Tr. 433).

On December 14, 2011, plaintiff underwent a psychiatric evaluation at the Hill Health Behavioral Health Division.  (Tr. 438-41).  When asked the reason for her referral for the evaluation, plaintiff responded, "I'm not sure -- she probably told me but I don't remember." (Tr. 438).  Plaintiff reported feeling "overwhelmed" since her accident in 2009, but denied a history of symptoms, denied hospitalizations, and denied "feeling significantly depressed." (Tr. 439, 441). She reported low energy and impaired sleep at times.  (Tr. 441).  Plaintiff was diagnosed with adjustment disorder, chronic with depressed mood.  (Tr. 440).

On August 9, 2012, a State Medical Examiner completed an Examination to Determine Condition of Driver for the Department of Motor Vehicles.  (Tr. 538-40).  In the report, it is noted that the school bus accident occurred on December 1, 2009, and that plaintiff's high blood pressure "started [at the] same time[.]" (Tr. 538).  Due to the accident, plaintiff experienced dizziness, head pain, spinal injury, low back pain, shoulder pain, and a loss of strength and feeling in her arm and hand and in her middle and ring finger.  (Id.).  She was found to be "[n]ot qualified to drive."  (Tr. 540).

D. MEDICAL OPINIONS

On September 1, 2010, Dr. Jeanne Kuslis completed a Residual Functional Capacity Assessment (Tr. 84-86), in which she opined that plaintiff can occasionally and frequently lift and/or carry up to twenty-five pounds, can stand and/or walk, or sit about six hours in an eight hour day, can frequently climb ramps or stairs, can frequently stoop and kneel, and can

occasionally climb ladders, ropes and scaffolds.  (Tr. 85).

A month later, on October 22, 2010, Dr. Jesus A. Lago examined plaintiff for Connecticut Disability Determination Services.  (Tr. 308-10).  Plaintiff reported that she was not depressed but felt overwhelmed.  (Tr. 308; see also Tr. 309).  At that time, she reported receiving worker's compensation.  (Tr. 308).  Dr. Lago noted that plaintiff's memory was in tact, she sustained concentration and persistence throughout the interview, she gets along well with supervisors and coworkers, and her prognosis was "excellent."  (Tr. 310).

On March 16, 2011, Dr. Nathaniel Kaplan completed a Residual Functional Capacity Assessment of plaintiff in which he reached the same conclusions of Dr. Kuslis.  (Tr. 96-97).  On October 28, 2011, Abigail Caldwell, APRN at Hill Health informed plaintiff's counsel that plaintiff's "[p]ain limits patient's ability to stand and walk for prolonged periods of time without breaks to sit and rest[,]" she is "unable to lift or carry more than [ten] pounds," her ability to push or pull is limited on her left side due to pain and numbness secondary to cervical radiculopathy and her ability to stoop and crouch are impaired by her pain and obesity.  (Tr. 358; see also Tr. 369).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.  Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d

117, 127 (2d Cir. 2008), quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); see also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).   The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id.  Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See  42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not working, as a

second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment. See 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that he cannot perform her former work. See 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant shows that she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Tracy found that plaintiff has not engaged in substantial gainful activity since December 23, 2009, the alleged onset date of her disability (Tr. 15-16; see 20 C.F.R. § 404.1571 et seq.). ALJ Tracy then concluded that plaintiff has the following severe impairments: cervical degenerative disc disease and obesity (Tr. 15; see 20 C.F.R.  § 404.1520(c)), but her impairment or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404.

19

(Tr. 17; see 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  In addition, at step four, ALJ Tracy found that after consideration of the entire record, plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except that she is able to lift/carry and push/pull up to ten pounds; sit, stand and/or walk four hours of an eight hour work day with a sit/stand option defined as the ability to sit for twenty minutes and stand for a few minutes; and is able to occasionally kneel and crawl and climb ramps, stairs, ladders, ropes and scaffolds, but cannot stoop or crouch.  (Tr. 17-19).  Plaintiff is unable to perform her past relevant work as a bus driver, supervisor, sales associate, packer, and teacher's aide, (Tr. 19; see 20 C.F.R. § 404.1565), but the ALJ concluded there are jobs that exist in significant numbers in the national economy that the plaintiff can perform, such as the job of a telephone operator, telemarketer, and claims clerk.  (Tr. 20; see 20 C.F.R. §§ 404.1569, 404.1569(a)). According to the ALJ, plaintiff has not been under a disability from December 23, 2009 through the date of her decision. (Tr. 21; 20 C.F.R. § 404.1520(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ's severe impairment findings were insufficient (Dkt. #14, Brief at 18-20); the ALJ failed to assess plaintiff's obesity in accordance with the law (id. at 20-23); the ALJ's credibility analysis is flawed and the ALJ's assessment of plaintiff's disabling pain is also flawed (id. at 23-31); the ALJ failed to perform the required combination of impairments analysis (id. at 32-33); and the ALJ's analysis of the plaintiff's functional capacity is flawed (id. at 34-38).

In response, defendant contends that substantial evidence supports the ALJ's finding at Step Two that plaintiff's mental impairments were not severe and that plaintiff's low back pain is not severe (Dkt. #19, Brief at 4-7); substantial evidence supports the ALJ's

assessment of plaintiff's RFC, particularly as it relates to plaintiff's handling and fingering ability, her obesity, the combined effect of her impairments, and her credibility (id. at 7-14); and the ALJ correctly determined that plaintiff could perform a significant number of jobs at Step Five of the sequential evaluation process.  (Id. at 14).

A. SEVERITY DETERMINATION

A claimant seeking social security benefits must bear the burden of showing that he or she has a medically severe impairment or combination of impairments.  See Bowen v. Yuckert, 482 U.S. 137, 146, n.5 (1987).  The severity regulation requires the claimant to show that she has an "impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c);  see Bowen, 482 U.S. at 146.

As stated above, in her decision, the ALJ concluded that plaintiff has severe impairments of cervical degenerative disc disease and obesity, and observed that plaintiff "has some recent mental health counseling primarily for feeling overwhelmed by family and physical stressors but has no psychotropic medication." (Tr. 15-16).  The ALJ continued:  "No mental impairment has been diagnosed by an acceptable medical source and confirmed by medically acceptable clinical findings. Thus, the undersigned finds that the claimant has no severe mental impairments." (Tr. 16).  Plaintiff contends that although she does not assert that her "depressive disorder (or mood disorder) is disabling in and of itself[,]" the "failure to find it a 'severe impairment' was an error of law, and the ALJ's complete failure to consider it in her assessment was an error of law compounded."  (Dkt. #14, Brief at 20).

In the Treatment Review Plan completed by Dana Mongillo, MS, and signed by a "[s]upervising [p]hysician" on October 31, 2011, plaintiff was diagnosed with depressive

disorder NOS, and rule out post traumatic stress disorder.  (Tr. 433-34).  A licensed physician is among the list of acceptable medical sources who can provide evidence to establish an impairment.  20 C.F.R. § 404.1513(a)(1).   Defendant is correct, however, the signature is illegible and, contrary to plaintiff's assertion, is far from "indisputably signed by an M.D." (Dkt. #14, Brief at 20 (footnote omitted); Dkt. #19, Brief at 5).   However, even assuming that the signature belongs to a licensed physician, and the ALJ incorrectly states that no acceptable medical source diagnosed plaintiff with a medically-determinable mental impairment, the ALJ's error on this issue is harmless.

"The mere diagnoses of an impairment 'says nothing about the severity of the condition.'" Burrows v. Barnhart, No. 03 CV 342 (CFD)(TPS), 2007 WL 708627, at *6 (D. Conn. Feb. 20, 2007), quoting Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988).  In this case, plaintiff twice stated to her treating providers that she felt "overwhelmed" since her accident in 2009, but denied feeling depressed.  (Tr. 438, 441).  Similarly, when plaintiff underwent a psychiatric consultative evaluation by Dr. Lago, she denied feeling depressed, denied changes in sleep, appetite or energy, and reported that while she feels "overwhelmed[,]" she feels that things will "get better in the future."  (Tr. 308-09). She appeared relaxed and coherent, and Dr. Lago noted that her speech was logical and goal directed, her affect was appropriate, her cognition was in tact, and she was "mentally quite stable." (Tr. 310).  Additionally, plaintiff consistently declined to take any medication to treat alleged mental impairments. (Tr. 433, 441).  See also Social Security Ruling ["SSR"] 96-7p, 1996 WL 374186, at *7 (S.S.A. July 2, 1996)("Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, . . . may be a strong indication that the symptoms are a source of distress to the individual and generally lend

support to an individual's allegations of intense and persistent symptoms.")(footnote omitted); Monette v. Astrue, 269 F. App'x 109, 113-14 (2d Cir. 2008)(considering the totality of medical and non-medical evidence, including that the claimant refrained from taking any pain medication, supports conclusion that claimant retained residual functional capacity to perform sedentary work).  Accordingly, while the ALJ may have erred in her conclusion that no acceptable medical source diagnosed plaintiff with a mental impairment, substantial evidence supports the ALJ's ultimate conclusion that plaintiff's mental impairments are not severe.[11]

### B. RFC ASSESSMENT

In her decision, the ALJ concluded that plaintiff:

has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except the claimant is able to lift/carry and push/pull up to [ten] pounds; sit, stand and/or walk [four] hours of an [eight] hour work day with a sit/stand option defined as the ability to sit for [twenty] minutes and stand for a few minutes.  The claimant is able to occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  The claimant can occasionally kneel and crawl but cannot stoop or crouch.

(Tr. 17).  The ALJ's RFC assessment mimics the second hypothetical posed to the vocational expert.  Specifically, in response to a second hypothetical posed by the ALJ of an individual limited to sedentary work who could lift, carry, push or pull ten pounds or less, sit, stand or walk for four hours with a sit/stand option such that the individual could sit for twenty minutes, stand for a few minutes, and sit as needed, as well as limited to occasional climbing of ramps and stairs, occasional kneeling, climbing of ladders, ropes or scaffolds, occasional

---

[11]Plaintiff also contends that the ALJ's "decision is notable for virtually ignoring . . . plaintiff's chronic, intractable [back] pain[.]" (Dkt. #14, Brief at 20).  Defendant responds that the physical therapy note upon which plaintiff relies in support of this statement does not "speak[ ] . . . to whether plaintiff's alleged low back pain affects her functional capacity in any way."  (Dkt. #19, Brief at 6).   Plaintiff does not elaborate on this argument other than to state that it will be discussed "at greater length below."  (Dkt. #14, Brief at 20).  See Section IV.B.3. infra.

crawling, and no stooping or crouching, the vocational expert opined that such an individual

could perform the work of a telephone operator, telemarketer, or claims clerk.  (Tr. 75-76).

In reaching this RFC determination, the ALJ adopted the most restrictive RFC assessment in

the record, namely, the opinion from Abigail Caldwell, APRN who noted that plaintiff's "[p]ain

limits patient's ability to stand and walk for prolonged periods of time without breaks to sit

and rest[,]" she is "unable to lift or carry more than [ten] pounds," "her ability to push or pull

is limited on her left side due to pain and numbness secondary to cervical radiculopathy" and

"her ability to stoop and crouch are impaired by her pain and obesity.  (Tr. 358; see also Tr.

369).[12] At the hearing, the vocational expert continued, if the limitation of occasional handling

and fingering was added, that hypothetical individual could not perform any of the referenced

jobs or any other work.  (Tr. 76).  Plaintiff contends that the ALJ erred in failing to include

a handling and fingering limitation in her RFC finding, failing to consider plaintiff's obesity,

failing to consider the combined effect of her impairments, and failing to conduct a proper

credibility analysis, including failing to properly consider plaintiff's pain.  (Dkt. #14, Brief at

20-38).  Defendant counters that substantial evidence supports the ALJ's assessment of

plaintiff's RFC.  (Dkt. #19, Brief at 7-14).

### 1. HANDLING AND FINGERING RESTRICTION

Plaintiff contends that it is "not merely that the evidence in this case is uncontradicted

– it is overwhelming – that the plaintiff has very significant restrictions in her left upper

extremity." (Dkt. #14, Brief at 35).  As plaintiff correctly observes, after examining plaintiff

for a neurological consultation on May 5, 2010, Dr. Hasbani noted "symptoms of numbness

---

[12]As discussed above, Dr. Kuslis and Dr. Kaplan opined that plaintiff can occasionally and
frequently  lift and/or carry up to twenty-five pounds, can stand and/or walk, or sit about six hours
in an eight hour day, can frequently climb ramps or stairs, can frequently stoop and kneel, and can
occasionally climb ladders, ropes and scaffolds.  (Tr. 85-86, 96-97).

in the left third and fourth fingers." (Tr. 297, 486). This finding is consistent with plaintiff's testimony that her left hand does not have feeling and she often drops things. (Tr. 43-44, 54; see also Tr. 226). After conducting an electrodiagnostic study Dr. Hasbani noted that the "borderline conduction across the wrist for the median nerve on the left [was] suggestive of an insipient carpal tunnel syndrome[,]" however, he also noted that the source of plaintiff's "symptoms of numbness" was "unclear." (Tr. 298-99, 487-88)(emphasis added). Defendant is correct that no other doctor identified the etiology of plaintiff's complaints. (Dkt. #19, Brief at 8). Thus, although the record is replete to references to plaintiff's hand numbness, and even includes findings by Dr. Hasbani substantiating her complaints, her symptoms were not confirmed by medical findings that show that plaintiff has a medical determinable impairment, and to the extent any carpal tunnel existed, Dr. Luchini classified it as "very mild." (Tr. 303). See also 20 C.F.R. § 404.1529(a) ("[S]tatements about . . . symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged . . . . "). "[T]here must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment[.]" 42 U.S.C. § 423(d)(5)(A). Additionally, Dr. Hasbani noted that even with the "decreased perception . . . in the fourth and fifth fingers of the left hand[,]"plaintiff retained full strength in her upper extremities upon examination, and Dr. Hasbani did identify not any functional limitations resulting from plaintiff's left hand numbness, nor did Drs. Kuslis and Kaplan, who completed Residual Functional Capacity Assessments. (Tr. 85-97, 297).[13] Accordingly, the ALJ did not err in failing to include a

---

[13]Plaintiff correctly argues that "the basis on which it can be said that the 'unremarkable' left shoulder MRI done in March 2011 is not consistent with the lack of functionality described by

handling and fingering limitation in her RFC determination.

## 2. OBESITY

In her decision, the ALJ found that plaintiff's obesity was a severe impairment (Tr. 15-16), but that the combined effect of her obesity with her other impairments does not meet the severity criteria in any listed requirement.   (Tr. 17).   While obesity is no longer an independent listing, it is a factor to be considered in conjunction with other listings in the Appendix.   SSR 00-3p, 2000 WL 33952015 (S.S.A. May 15, 2000); SSR 02-01p, 2000 WL 628049 (S.S.A. Sept. 12, 2002); see Revised Listing 1.00Q (musculosketal system).   "[T]he combined effects of obesity with other impairments may be greater than might be expected without obesity."   SSR 02-1p, at *6.   "At steps four and five, the ALJ must evaluate obesity in conjunction with [the] claimant's residual functional capacity by assessing the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment."   Crossman v. Astrue, 783 F. Supp. 2d 300, 309-10 (D. Conn. 2010)(citations & internal quotations omitted).

As an initial matter, while the record contains many references to plaintiff's obesity, plaintiff does not identify any documents suggesting that her obesity worsened her impairments or restricted her ability to work.   In this case, unlike in Crossman, the ALJ did consider plaintiff's height and weight, and she noted that Dr. Luchini, who referenced plaintiff's height and weight in conjunction with plaintiff's sustained cervical sprain during his

---

the claimant in her testimony[ ] is a medical judgment that the ALJ is not competent to make." (Dkt. #14, Brief at 36)(footnote omitted).   That said, however, no doctor identified the etiology of plaintiff's left hand complaints, and when evaluated for surgery for her neck and left arm pain, Dr. Grauer informed plaintiff that surgery was not recommended, and her "upper extremity symptoms do not well map with the mid cervical changes by MRI and do not seem to be as much of her limiting factor." (Tr. 359).   Additionally, whether objective medical testing supports a plaintiff's complaints of pain is a relevant factor in the ALJ's credibility analysis. See 20 C.F.R. § 404.1529(c). See Section IV.B.4. infra.

initial surgical consultation on March 10, 2010, also concluded that plaintiff could return to work as a bus driver with no restriction. (Tr. 16; <u>see</u> Tr. 306).  On March 10 and again on September 22, 2010, Dr. Luchini repeated his opinion that plaintiff could return to her past work as a bus driver.  (Tr. 302-03, 306).  The ALJ considered whether plaintiff's combined impairments were medically equivalent to Listing 1.04 and concluded that plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments."  (Tr. 17).  <u>See also</u> <u>Wages v. Comm'r of Soc. Sec.</u>, No. 3:11 CV 1571 (JCH), 2013 WL 3243116, at *5 (D. Conn. Jun. 26, 2013)(concluding that such consideration was sufficient); <u>see Francis v. Astrue</u>, No. 3:09 CV 1826 (VLB)(TPS), 2010 WL 3432839, at *4 (D. Conn. Aug. 30, 2010)(same), Magistrate Judge's Recommended Ruling adopted over objection, 2011 WL 344087 (D. Conn. Feb. 1, 2011).  Additionally, the ALJ assigned "great weight" to the opinion of Nurse Caldwell, who opined that plaintiff's "[p]ain limits [her] ability to stand and walk for prolonged periods of time without breaks to sit and rest[,]" she is "unable to lift or carry more than [ten] pounds," "her ability to push or pull is limited on her left side due to pain and numbness secondary to cervical radiculopathy" and "her ability to stoop and crouch are impaired by her pain and obesity."  (Tr. 19, 358; <u>see also</u> Tr. 369).  The ALJ incorporated these limitations, including those affected by plaintiff's obesity, into her RFC findings.  (Tr. 17).   As Chief Judge Janet C. Hall held in <u>Wages</u>, "the court believes that [the ALJ's] reference at the RFC stage to the overall impact of [plaintiff's] obesity on all of her symptoms and impairments suggests that [she] considered such factors throughout [her] analysis, including when determining that her combination of impairments did not equal one of the listed impairments."  2013 WL 3243116, at *5, n.3.

### 3. COMBINED EFFECT OF IMPAIRMENTS

Plaintiff contends that, in addition to plaintiff's obesity, as discussed in Section IV.B.2. infra, the ALJ did not consider plaintiff's mental impairments, including her chronic pain. (Dkt. #14, Brief at 32).   It is well-settled that the ALJ must consider all of plaintiff's impairments individually, and in combination, even if an impairment, when considered separately, would not be of sufficient severity to serve as a basis for eligibility for disability benefits.  See 20 C.F.R. § 404.1523; SSR 85-28, 1985 WL 56856, at *3 (S.S.A. 1985).   While plaintiff contends that the ALJ, in this combination of impairments case, does not consider plaintiff's left lower extremity, her mental impairments, and her pain, plaintiff fails to argue the effects of these impairments that the ALJ failed to consider.  (See Dkt. #14, Brief at 32). See Thomas v. Astrue, No 3:11 CV 1625 (MPS), 2013 WL 4746371, at *14 (D. Conn. Sept. 4, 2013)(rejecting plaintiff's conclusory argument that the ALJ failed to properly consider the combined effects of the plaintiff's impairments).  In her decision, the ALJ considered plaintiff's neck pain with parasthesias and numbness of the left upper extremity, plaintiff's grip strength weakness, her high blood pressure, her "recent mental health counseling[,]" and her pain in her back.  (Tr. 15-19).   The ALJ acknowledged her duty to consider all of plaintiff's impairments, both severe and non-severe (Tr. 17), as well as "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence  and other evidence[.]"  (Id.). The ALJ concluded, consistent with the medical records, that the objective medical findings did not correlate with plaintiff's upper extremity symptoms (Tr. 16);  plaintiff's blood pressure was "well controlled and there is no indication from the record that this condition is limiting[,]" (id.); plaintiff reported that rather than feeling depressed, she felt "overwhelmed by family and physical stressors[,]" (id.); and that plaintiff's pain and numbness in her back, neck and left arm result in limitations accounted for in the ALJ's RFC finding.  (Tr. 19; see Tr. 17).  The ALJ assessed plaintiff with

28

an RFC that was based upon the combination of all of plaintiff's impairments.  See Seekins v. Astrue, No. 3:11 CV 264 (TPS)(VLB), 2012 WL 4471266, at *7 (D. Conn. Aug. 14, 2012)(no error when ALJ states he considered claimant's impairments in combination and properly examined the medical records and considered the combination of impairments together in determining plaintiff's RFC, and the fact that each element of the record was discussed individually does not suggest that a totality of the record was not considered), Magistrate Judge's Recommended Ruling adopted over objection, 2012 WL 4471265 (D. Conn. Sept. 27, 2012).  Accordingly, the ALJ did not err in this regard.

### 4. CREDIBILITY ASSESSMENT

"The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence . . . ."  Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).   When assessing a claimant's credibility, an ALJ is required to consider (1) medical signs and laboratory findings; (2) the diagnoses, prognoses, and other medical opinions provided by the medical sources; and (3) statements and reports from the individual and from treating or examining physicians and psychologists and others about the claimant's medical history, treatment and response, prior work record, efforts to work, daily activities, and other information concerning the claimant's symptoms and how they affect the claimant's ability to work.   SSR 96-7p, 1996 WL 374186, at *5.   "After weighing any existing inconsistencies between the plaintiff's testimony of pain and limitations and the medical evidence, the ALJ may discount the plaintiff's subjective testimony with respect to the degree of impairment."  Romano v. Apfel, No. 99 CIV. 2689 LMM, 2001 WL 199412, at *6 (S.D.N.Y. Feb. 28, 2001)(citations omitted).  Thus, an ALJ is entitled to make a determination that the claimant's subjective complaints of pain are inconsistent with the objective medical evidence, see 20 C.F.R. § 404.1529(a); see also Reyes v. Astrue, No. 3:11

29

CV 1403 (AVC), 2013 WL 696498, at *5 (D. Conn. Feb, 26, 2013); however, if an ALJ discredits a plaintiff's testimony, he or she must do so with "sufficient specificity[.]" Romano, 2001 WL 199414, at *6 (citation omitted).

Plaintiff contends that the ALJ's assessment of plaintiff's credibility "is absurd[,]" and is "facially inconsistent with crediting the plaintiff's testimony at her hearing[.]" (Dkt. #14, Brief at 23). Plaintiff argues that the ALJ erred in assigning less credibility to plaintiff's testimony of "performing minimal activities of daily living" when compared to plaintiff's August 8, 2010 report prepared in connection with her application for disability. (Id. at 24). At her hearing on January 31, 2012, plaintiff testified that she needs help with all household chores, and needs help with getting dressed, going up and down stairs, going shopping, and preparing food. (Tr. 56-57). In 2010, plaintiff reported, however, that she does housework, washes dishes, sometimes does laundry, and gives her dogs water, food and medicine. (Tr. 223). Although plaintiff is correct in pointing out that the testimony was taken a year and a half after plaintiff completed the 2010 form, plaintiff does not point to a deterioration in plaintiff's medical condition over this time period. Moreover, when plaintiff was seen by Dr. Lago in October 2010, she reported that she cooks and cleans, does chores, "takes care of her [activities of daily living,]" and "functions independently." (Tr. 309). This further supports the ALJ's credibility finding regarding plaintiff's activity level. Additionally, in evaluating a claimant's credibility, an ALJ "may . . . properly rely on . . . testimony concerning plaintiff's daily activities[,]" Bathrick v. Astrue, No. 3:11 CV 101 (VLB), 2012 WL 1068985, at *6 (D. Conn. Mar. 29, 2012), citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)(ALJ did not err in making adverse determination of claimant's credibility based on inconsistencies between the claimant's descriptions of her diverse daily activities and her claims of infirmity); Smolen v. Chater, 80 F.3d 1273, 1284 & n.7 (9th Cir. 1996)(in determining the credibility of

a claimant's testimony about the severity of symptoms, an ALJ may consider the claimant's daily activities); Crowley v. Barnhart, 220 F. Supp. 2d 176, 180-81 (W.D.N.Y. 2002)(in assessing a claimant's credibility, ALJ considers various factors, including claimant's daily activities), and it is well within the province of the ALJ to consider whether there are any "inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence[.]" 20 C.F.R. § 404.1529(c)(4).[14] Accordingly, the ALJ did not err in her credibility assessment of plaintiff.

### C. STEP FIVE ANALYSIS: SIT/STAND OPTION

Plaintiff contends that the ALJ's definition of a "sit stand option" as "the individual could sit for twenty minutes, stand up for a few minutes, and then sit down as they need to . . . [,]" erroneously assumes that an individual can stand at a work station, working unabated.  (Dkt. #14, Brief at 37; see Tr. 75).  Plaintiff contends that the vocational expert made a "bald assertion" in testifying that his testimony was consistent with the DOT, when the Dictionary of Occupational Titles does not include a sit/stand option.  (Dkt. #14, Brief at 37).  Additionally, plaintiff testified that she thought she could only sit for twenty minutes and could not "stand in one spot" at all.  (Tr. 53).

"Occupational evidence provided by a [vocational expert] . . . generally should be consistent with the occupational information supplied by the DOT."  SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000).  When a conflict exists between the vocational expert's testimony and the DOT, the ALJ "must elicit a reasonable explanation for the conflict before

---

[14]Plaintiff also contends that the ALJ misinterpreted a statement from Dr. Grauer and "played doctor[.]" (Dkt. #14, Brief at 24-28).  See note 13 supra.  The ALJ does not err in relying on medical opinion evidence to determine plaintiff's RFC.  The ALJ's references to plaintiff's range of motion and grip strength are supported by the medical record.  (See Tr. 306, 326-29, 389-92, 521-24).

relying on the [vocational expert's] . . . evidence to support a determination or decision about whether the claimant is disabled." Id. The "duty to inquire arises only when the conflict between the DOT and [vocational expert] testimony is apparent." Zblewski v. Astrue, 302 F. App'x 488, 494 (7th Cir. 2008)(citation omitted). "Because the DOT does not address the subject of sit/stand options, it is not apparent that the testimony conflicts with the DOT." Id. In Zblewski, however, the court continued that "even if the ALJ failed to comply with SSR 00-4p, that failure was harmless because the ALJ was entitled to rely on other, unchallenged [vocational expert] testimony." Id.; see 20 C.F.R. § 404.1566(d)(a vocational expert is permitted to rely on sources other than the DOT in evaluating a hypothetical). In that case, the vocational expert testified that "based on his experience, 2000 assembly jobs allowed a sit/stand at-will option[,]" so that the court concluded that because "these 2000 assembly jobs the [vocational expert] identified would remain available," the error was harmless. 302 F. App'x at 494-95 (citation omitted); see also Coleman v. Astrue, 269 F. App'x 596, 602 (7th Cir. 2008)(harmless error in ALJ's failure to inquire about conflict when a significant number of jobs were identified were not inconsistent with the DOT). Similarly, several courts have found it harmless error for an ALJ to fail to solicit a reasonable explanation for a vocational expert's inclusion of a sit/stand option in his evaluation of available jobs contained in the DOT when the vocational expert provided sufficient support for his conclusion justifying any potential conflicts.[15] See Flores v. Colvin, No. 11-17786, 2013 WL 5861981, at *2 (9th Cir. Nov. 1, 2013)(harmless error when vocational expert testified that although the DOT does not discuss a sit-stand option, his testimony was limited to positions with that option and

---

[15]Evidence sufficient to justify potential conflicts "may be either specific findings of fact regarding the claimant's residual functionality, or inferences drawn from the context of the expert's testimony." Light v. Soc. Sec. Admin., 119 F.3d 789, 793 (9th Cir. 1997)(internal citations omitted).

discussed why the DOT's language does not disqualify claimant from the position); Baranich v. Barnhart, 128 F. App'x 481, 485 (6th Cir. 2005)(harmless error when vocational expert testified that his conclusions were consistent with the DOT, "except that the DOT does not state whether jobs have a sit/stand option[,]" and, "based on his twenty-two years of experience placing disabled individuals, these jobs typically offer a sit or stand option."); Wilk v. Colvin, No. C13-642-JLR, 2014 WL 31274, at *4-5 (W.D. Wash. Jan. 3, 2014)(vocational expert provided "sufficient support to support her conclusion so as to justify the conflict" by explaining how an employee could perform identified jobs while sitting or standing)(citation omitted); see also Wilkins v. Colvin, No. 3:13 CV 49, 2014 WL 29558, at *2 (S.D. Ohio Jan. 3, 2014)(vocational expert testified that his testimony is consistent with the DOT, and although the sit/stand option was not addressed in the DOT, he considered published research).

In this case, the vocational expert neither noted that the DOT does not state whether jobs have a sit/stand option, nor did he offer testimony relating to his experience as to whether the jobs he listed typically offer a sit or stand option. See Baranich, 128 F. App'x at 485. Rather, in response to ALJ's hypothetical including several factors along with "a sit stand option such that the individual could sit for [twenty] minutes, stand up for a few minutes, and then sit down as . . . need[ed,]" the vocational expert only listed the job names, the skill levels, the exertion levels, and the DOT numbers, and the numbers of jobs available in Connecticut and nationally, and when asked by the ALJ if his testimony was consistent with the DOT, he responded in the affirmative, without reservation. (Tr. 75-77). In this case, the vocational expert did not identify the conflict, i.e., acknowledge that the sit/stand option is not in the DOT, nor did the ALJ receive a reasonable explanation for the conflict by way of the vocational expert explaining whether in his experience, or whether other data reveals

that, the number of available jobs would be reduced accounting for the sit/stand option. "Where the ALJ fails to take these steps, we cannot determine whether substantial evidence supports the ALJ's step five findings."  Manes v. Astrue, 267 F. App'x 586, 589 (9th Cir. 2008)(citation omitted)(remand when ALJ does not inquire into the discrepancy nor receive a reasonable explanation for the conflict).

V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion to Reverse (Dkt. #14) is granted in limited part such that this matter is remanded for further consideration and testimony with respect to occupational evidence relating to a "sit/stand" option and is denied in all other respects; and defendant's Motion to Affirm (Dkt. #19) is denied in limited part with respect to "sit/stand" and is granted in all other respects.

The parties are free to seek a district judge's review of this recommended ruling.  See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.


Dated at New Haven, Connecticut, this 14th day of February, 2014.


 /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge


34